UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jespersen et al

     v.                                        Civil No. 21-cv-846-JL
                                                  Opinion No. 2023 DNH 064
Colony Insurance Company

**<u>MEMORANDUM ORDER</u>**

    At issue in these cross-motions for summary judgment are the applicability of the compulsory insurance doctrine, and an injured party's right to recover under an insurance policy notwithstanding the insured's failure to satisfy the insurance contract's notice requirements.  The plaintiffs in this case, Margaret and David Jespersen, are New Hampshire residents who obtained a default judgment in state court against the owner-operator of Penuches Musical Hall after Margaret fell on the restaurant's premises and suffered injuries.  Penuches did not appear or take part in the proceedings leading up to the default judgment, nor did it notify its insurance carrier, defendant Colony Insurance Company, of Margaret's fall or the resulting litigation.  Colony first received notice of these issues from plaintiffs' counsel roughly four months after the default judgment was entered.

    The plaintiffs now seek to collect the judgment, which amounts to almost $400,000, from Colony under the insurance policy that Penuches held at the time of Margaret's fall.  On cross-motions for summary judgment, Colony contends that Penuches' failure to notify it of Margaret's fall and the related litigation constitutes a

material breach of the insurance contract and relieves Colony of any duty to pay.  The plaintiffs, in turn, assert that the compulsory insurance doctrine applies to nullify the notice defense and compel Colony to pay the default judgment.

The court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity), as the plaintiffs are New Hampshire residents, and Colony is a Virginia corporation.  After reviewing the parties' submissions and holding oral argument, the court grants Colony's summary judgment motion, upon finding that Penuches was delayed in notifying Colony of Margaret's fall, the record indicates no justification for this delay, and the delay resulted in prejudice to Colony.  The court denies the plaintiffs' motion because New Hampshire courts apply the compulsory insurance doctrine only in narrow circumstances, which are not present in this case.

## I.   <u>Applicable legal standard</u>

For cross-motions, the court views "each motion, separately, in the light most favorably to the non-moving party, and draw[s] all reasonable inferences in that party's favor."  Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 943 F.3d 49, 55 (1st Cir. 2019).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the

potential of affecting the outcome of the case."  Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation omitted).[1]

## II.   **Background**

The following facts are not in dispute.[2]  On May 28, 2018, the Jespersens visited Penuches in Manchester, New Hampshire.  They sat in the outdoor dining area, which was located on the sidewalk in front of the restaurant.  Both Margaret and David are legally blind, and were carrying their probing canes that day.  They entered the establishment at some point and asked an employee where the restroom was located.  The employee informed them that the restrooms were in the basement, and the Jespersens asked if an elevator was available.  Despite the availability of an elevator, the employee told the Jespersens otherwise and directed them to a flight of stairs.

As Margaret was descending the staircase, her cane got caught in the railing and she fell down nine stairs, resulting in injuries including multiple fractures.  The

---

[1] The parties disagree as to who bears the burden of proof in this action.  The court does not need to reach this issue because, as detailed infra Section III, it resolves the summary judgment motions based on undisputed facts.

[2] Local Rule 56.1 requires that a memorandum in support of a summary judgment motion "incorporate a short and concise statement of material facts . . . as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  The plaintiffs' memorandum, while containing thoughtful and well-researched positions, also includes a statement of "undisputed" facts replete with argumentation, legal citations, "spin," and disputed factual assertions.  This detracts from the purpose of the statement of material facts, which is to focus "a district court's attention on what is--and what is not--genuinely controverted," and results in additional record-checking and difficulties for the court when resolving the motion.  Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).  The court urges counsel to comply with Local Rule 56.1 in the future.

paramedics arrived and placed her on a stretcher, at which point another Penuches employee suggested that the paramedics use the restaurant's elevator to transport Margaret upstairs to the street level.  At some point after this incident, Penuches posted a sign at the top of its stairs stating that an elevator was "available upon request."

### A. Penuches' insurance policy

Penuches operated its sidewalk dining area pursuant to a license issued by the city of Manchester.  Section 97.34 of the Manchester Code of Ordinances sets forth a general prohibition against sidewalk encumbrances, but also enables businesses in a portion of downtown to apply for licenses allowing such encumbrances, subject to certain conditions.  Section 97.34(B)(2) requires that the licensees abide by § 115.60's insurance requirements.  Section 115.60, in turn, provides that the application for a license must include "a certificate of insurance" showing "that the applicant has been issued an insurance policy by an insurance company licensed to do business in the state," which "protect[s] the licensee and the city from all claims . . . which may arise from operations under or in connection with the license."  Manchester Code of Ordinances § 115.60(B)(7)(a).  The ordinance further provides that "the policy shall not terminate or be cancelled prior to the expiration date except with 30 days' advance written notice to the city."  Id.

At the time of Margaret's fall, Penuches held a commercial general liability insurance policy issued by the defendant Colony.  Penuches' insurance agent, Frontline Insurance Company, submitted a certificate of insurance to the city confirming that the policy was effective as of April 2018, and that the city was listed as an additional insured

under the policy.[3]  The insurance contract provided that Colony was bound to "pay those sums that the insured become legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which th[e] insurance applies."[4]

Section IV of the policy is entitled "Commercial General Liability Conditions." Parts 2(a) and 2(b) of Section IV require Penuches to notify Colony "as soon as practicable" of any claims or suits brought against Penuches, as well as any "'occurrence' or [] offense which may result in a claim."[5]  Part 2(c) adds that Penuches must "[i]mmediately send [Colony] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit,'" and cooperate in the "investigation and settlement of the claim or defense against the 'suit.'"[6]  Finally, Part 3 states that no party can sue Colony "unless all of the terms" of the policy, including the notice provisions, "have been fully complied with."[7]

The insurance policy was ultimately cancelled in September 2018, a few months after the plaintiffs' visit to Penuches, for failure to pay the premium.  The city was not provided advance notice of the cancellation, as required under § 115.60 of the

---

[3] See doc. no. 43-7 at 1-4; see also doc. no. 45-21 at 1-5.

[4] Doc. no. 45-21 at 6.

[5] Id. at 16.

[6] Id.

[7] Id.

Manchester Code.  Instead, the city learned of the cancellation months later, around April 2019.

### B.  Procedural background

The plaintiffs retained counsel after Margaret's May 2018 fall.  Plaintiffs' counsel sent Penuches a letter in September 2018 discussing the injuries Margaret suffered after the fall, Penuches' potential liability, and the plaintiffs' interest in settling the matter without litigation.[8]  Penuches did not respond or notify Colony of these developments.

A few months later, on November 20, 2018, the plaintiffs filed a complaint against Penuches with the New Hampshire Commission for Human Rights, asserting that the actions of the Penuches employee who directed Margaret to take the stairs constituted disability-based discrimination.  Shortly after the complaint was forwarded to Penuches, its owner contacted plaintiffs' counsel over the telephone.  Counsel responded with a letter dated the same day as the complaint.  In the letter, counsel acknowledged that the owner "seem[ed] to indicate" that he "did not intend to advise [his] insurance carrier."[9] Counsel "encourage[d] [the owner] to not follow that course . . . ."[10]  Penuches did not respond or inform Colony of the legal action.

In June 2019, the plaintiffs removed their case to Hillsborough Superior Court, where they asserted claims for negligence, unlawful discrimination in violation of N.H.

---

[8] See doc. no. 45-4.

[9] Doc. no. 45-8 at 2.

[10] Id.

Rev. Stat. Ann. 354-A, and loss of consortium.  Plaintiffs' counsel also sent Penuches a

letter the following month, stating that Penuches was required by court rules to "identify

all insurance that may be available in coverage for th[e] injury" and requesting that

Penuches advise its insurance carrier of the suit.[11]  Again, Penuches did not respond to

the complaint or notify Colony of the suit.

In December 2019, the plaintiffs filed a motion for the entry of default judgment,

and the state court held a hearing in August 2020.  Penuches did not respond to the

hearing notice or appear at the hearing.  On October 7, 2020, the state court entered a

default judgment in favor of the plaintiffs and awarded them $193,686.91 in

compensatory damages, consisting of past and future medical expenses; lost wages; loss

of consortium; and pain, suffering, and loss of enjoyment of life.  The court also granted

$100,000 in enhanced compensatory damages and $97,896.30 in attorney's fees under

RSA 354-A:21-a.  The court awarded attorney's fees based on two findings--that

Margaret's injury "apparently resulted in the public benefit of having [Penuches] . . .

make the elevator available to other patrons with disabilities," and that Penuches was

"totally unresponsive to th[e] litigation[,] . . . [and this] utter disregard of th[e] case . . .

left the plaintiffs without compensation or relief."[12]

About four months later, plaintiffs' counsel sent Colony a letter dated February 12,

2021, notifying it of Margaret's fall, the resulting lawsuit, and the default judgment, and

---

[11] See doc. no. 45-10 at 2-3.

[12] Doc. no. 45-14 at 7.

requesting payment.  This was the first time Colony was informed of these matters.  The parties were unable to come to an agreement regarding payment, and the plaintiffs filed suit in this court in October 2021 to collect the default judgment from Colony under the insurance policy.

## III.   <u>Analysis</u>

The parties present cross-motions for summary judgment.  Colony argues that Penuches breached the insurance contract by failing to notify it of Margaret's fall or the resulting suits "as soon as practicable," and thereby released Colony from its payment obligations under the policy.  The plaintiffs invoke the compulsory insurance doctrine to attempt to overcome Colony's notice defense.  As explained further below, where applicable, this doctrine compels an insurer to pay a judgment creditor notwithstanding any contract defenses it can assert against the insured party.  The court begins by considering Colony's notice defense, and then assesses whether the compulsory insurance doctrine applies to defeat the defense.

### A.   **Colony's notice defense**

As noted above, <u>supra</u> Section II.A, the insurance policy in effect at the time of Margaret's fall included, as a condition for coverage, that notice of occurrences, claims, and suits be given to Colony as soon as practicable.  "Notice 'as soon as practicable' under New Hampshire law means notice within a reasonable time, given the facts and circumstances of the case."  St. Paul Fire & Marine Ins. Co. v. Petzold, 418 F.2d 303, 305 (1st Cir. 1969) (quoting Sutton Mutual Insurance Co. v. Notre Dame Arena, Inc., 108

N.H. 437 (1968)).  A breach of such a notice provision "relieve[s] the insurer of its

obligation to defend and pay any judgments," if the breach is found to be substantial.

Wilson v. Progressive N. Ins. Co., 151 N.H. 782, 785 (2005) (internal quotation omitted).

This determination is a question of fact . . . unless the circumstances are such that no

reasonable person could find that notice was given as soon as was reasonably possible, in

which case the court may make a determination as a matter of law." Dover Mills P'ship

v. Com. Union Ins. Companies, 144 N.H. 336, 338 (1999) (internal quotations and

alterations omitted).

Courts consider three factors in assessing whether there has been a substantial

breach of a notice provision--"the length of the delay [in notification], . . . the reasons for

the delay[,] and whether the delay resulted in prejudice to the insurer." Wilson, 151 N.H.

at 785.  Here, the undisputed facts cannot reasonably support a finding that Penuches

provided notice as soon as practicable, consistent with the policy.  To begin, it is

undisputed that Colony first received notice of Margaret's fall two years and nine months

after the incident occurred.  This constitutes a lengthy delay.  See Dover Mills, 144 N.H.

at 340 (finding an eight-month delay in notification after an accident to be "lengthy");

Com. Union Assur. Companies v. Monadnock Reg'l Sch. Dist., 121 N.H. 275, 277

(1981) ("There is no question that the delay in this case was substantial[;] [w]e are not

dealing here with a delay of a few weeks or months but one of almost two years."); Am.

Fid. Co. v. Schemel, 103 N.H. 190, 196 (1961) ("There being no extenuating

circumstances justifying a delay of at least one year and fifteen days, we hold that there

was no evidence to support a finding that the notice was given as soon as practicable as required by the policy").

Next, the court finds no reason or excuse for this delay in the record--nor do the plaintiffs identify any.  To the contrary, the record indicates that plaintiffs' counsel sent multiple letters to Penuches encouraging it to notify Colony--in September and November 2018, as well as in July 2019--but Penuches did not do so.

Finally, the third factor, which concerns prejudice to the insurer, requires the court to consider whether the delay frustrated "the purpose" of the notice provisions, which is "to enable the insurer to make a prompt investigation of the incident and to prepare an adequate defense to a claim." Petzold, 418 F.2d at 305 (internal citation omitted). Though the insurer need not "show actual loss of evidence" during the delay "to demonstrate prejudice, . . . it must at the very least provide the court with facts showing prejudice and not merely surmise that it may be prejudiced because certain events may have occurred in the abstract during the period of delay." Dover Mills, 144 N.H. at 340.

Colony first received notice of Margaret's fall and the plaintiffs' suits about four months after default judgment was entered against Penuches.  As a result, Colony did not have the opportunity to engage in settlement discussions prior to (or instead of) litigation, as plaintiffs' counsel suggested to Penuches in its initial September 2018 letter.  Nor was Colony able to defend Penuches in the litigation.

Penuches' (and thus Colony's) absence from the proceedings was consequential to the court and factored into its calculation of damages.  The court premised its grant of attorney's fees--which amounted to roughly one-quarter of the damages awarded--on

Penuches' unwillingness to participate in the case, as well as the public benefit resulting from Margaret's injuries.[13]  Under these circumstances, prejudice is not a close question; it would be unreasonable to conclude that Colony was not prejudiced by its inability to participate in the state court proceedings prior to the entry of default judgment.  Accord Nautilus Ins. Co. v. Gwinn Design & Build, LLC, No. 18-CV-633-JD, 2018 WL 6519071, at *3 (D.N.H. Dec. 11, 2018) (DiClerico, J.) (finding that the insurer was prejudiced where it was notified of the injured party's claims against the insured after default judgment was entered); Tiede v. Seneca Specialty Ins. Co., No. 17-CV-10074-ADB, 2019 WL 1230363, at *7 (D. Mass. Mar. 15, 2019) (noting that a post-notification investigation report "suggests that [the insurer] had strong grounds on which it could have defended" the lawsuit, and concluding that the insurer was prejudiced "as it did not receive the information necessary to appear and defend until after the default had entered and the assessment of damages hearing had occurred").

The plaintiffs contend that Colony's notice defense should fail because Colony would have learned of Margaret's fall on its own had it carried out its purported obligation under city ordinance to inform the city of the September 2018 cancellation of the insurance policy.  See Manchester Code § 115.60(B)(7)(a) (the insurance policy "shall not terminate or be cancelled prior to the expiration date except with 30 days' advance written notice to the city").  As part of this argument, the plaintiffs point out--

---

[13] At oral argument, the plaintiffs' very able counsel basically conceded that this constituted prejudice.

and Colony does not dispute--that from May to September 2018, Penuches repeatedly rebuffed an underwriting agency's attempts to complete an on-site inspection, which was required to keep the insurance policy in effect.  The plaintiffs argue that if Colony had notified the city of the policy's cancellation, the city would have enforced the sidewalk encumbrance ordinance's insurance requirement, including by "requiring Penuches to complete the inspection process to avoid cancellation of the [p]olicy."[14]  According to the plaintiffs, this inspection or other actions taken by the city to enforce the insurance requirement "would have . . . uncovered [Margaret's] accident."[15]

This argument cannot prevail.  As an initial matter, even if the court assumes that the ordinance places the responsibility of reporting the policy's cancellation on the insurance carrier, this would not rid Penuches of its notice obligations under the insurance contract, nor would it change the fact that Penuches violated those obligations. Further, the plaintiffs' argument is wholly based on conjecture.  They are essentially arguing that Colony cannot assert a notice defense because it did not take action to set off a potential chain of events that may have resulted in Colony receiving notice of Margaret's fall.  The plaintiffs do not point to case law crediting this type of speculative challenge to a notice defense, and the court is not aware of any.

---

[14] Pls.' Reply (doc. no. 47-1) at 3.

[15] Id.

In short, the court finds, as a matter of law, that Penuches' delay in notifying Colony was lengthy and unjustified, and it resulted in prejudice to Colony. Colony's notice defense is thus meritorious.

### B.    Compulsory Insurance Doctrine

The court now turns to the plaintiffs' summary judgment motion, in which they argue that the compulsory insurance doctrine applies here and requires Colony to pay the default judgment, regardless of Colony's notice defense. As plaintiffs' counsel candidly acknowledged at oral argument, a finding of inapplicability of the doctrine likely ends the plaintiffs' case.

The court draws the general contours of the doctrine from the same treatise on insurance law that the plaintiffs cite in their filings. The starting point is a "compulsory insurance law[] which mandate[s] that those engaged in particular activities have insurance." Steven Plitt, et al., Couch on Insurance §19:5 (3d ed.). When injured parties seek to recover under insurance policies issued pursuant to compulsory insurance laws, courts adhering to the doctrine have "generally" followed the rule that the injured parties "are not subject to defenses arising out of the breach of conditions subsequent to the accident even though they would be available to the insurer as against the insured." Id. at § 106:27. This rule is premised on the rationale that "such [compulsory insurance] statutes are for the benefit of members of the public and not of the insured." Id. (emphasis added)

In New Hampshire, courts largely, if not exclusively, apply this rule to shield injured parties from insurance contract defenses in the context of motor vehicle liability

policies, which are subject to the New Hampshire Financial Responsibility Act. The Act provides that "[t]he liability of any company under a motor vehicle liability policy shall become absolute whenever loss or damage covered by said policy occurs, and the satisfaction by the insured of a final judgment for such loss or damage shall not be a condition precedent to the right or duty of the company to make payment on account of said loss or damage." RSA § 264:18. In applying the compulsory insurance doctrine, courts in New Hampshire have pointed to this language, finding that it is "unqualified in its provision that conduct of the insured avoiding the policy as to him shall not avoid it as to those to whom he is under insured liability." Bosse v. Wolverine Ins. Co., 190 A. 715, 717 (1937). Courts have also consistently held that the "purpose of the New Hampshire Financial Responsibility Act was fundamentally to provide compensation for innocent persons that might be injured through faulty operation of motor vehicles." Hartford Acc. & Indem. Co. v. Wolbarst, 95 N.H. 40, 43 (1948) (quoting In re Opinion of the Justices, 81 N.H. 566 (1925)); see also Peerless Ins. Co. v. Vigue, 115 N.H. 492, 494 (1975) ("The paramount purpose of the Financial Responsibility Act is not to protect the tortfeasor, but to provide compensation to persons harmed by the negligent operation of motor vehicles.").

The case law establishes that, in New Hampshire, the compulsory insurance doctrine is applied to give effect to the Financial Responsibility Act's express terms and well-established, central purpose of protecting parties injured by the operation of motor vehicles. The plaintiffs do not cite a New Hampshire case that applies the doctrine outside of these narrow confines. Nor is the court aware of any.

Nevertheless, the plaintiffs, appealing to the underlying rationale of the compulsory insurance doctrine, insist that the court must apply the doctrine here because the Manchester ordinances that set forth the insurance requirement are aimed, at least in part, at protecting the public. This argument is insufficient. Of course, at the highest possible level of generality, a public safety purpose can be found in any city ordinance, to some extent. Upon careful review, the court does not find that this purpose is particularly salient in these ordinances, such that it would justify deviating from longstanding New Hampshire precedent to extend the compulsory insurance doctrine to this novel set of circumstances.

The court turns now to the task of determining the purpose of the subject ordinances. In this analysis, the court is guided by the basic principle of statutory interpretation,[16] that "absent a clearly expressed legislative intention to the contrary," it is assumed that "legislative purpose is expressed by the ordinary meaning of the words used." Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 769 (2019) (quoting American Tobacco

---

[16] The court notes at the outset that it engages in an examination of the ordinances' purpose to determine the applicability of the compulsory insurance doctrine, and not as a matter of statutory interpretation, since the meaning of the unambiguous ordinances is not in dispute here. The court offers this clarification because, under the rules of statutory interpretation, permissible inquiry into statutory purpose is limited to certain, well-known circumstances, which are not present here and start with ambiguity in the provision in question. See, e.g., 2A Sutherland Statutory Construction § 45:9 ("Modern courts . . . generally . . . discuss the issue of a statute's 'purpose,' or 'policy,' or 'object' in terms of their search for legislative intent . . . . The typical starting point acknowledges that a statute's purpose can help decode ambiguous text, but there first indeed must be some ambiguity."); Soraghan v. Mt. Cranmore Ski Resort, Inc., 152 N.H. 399, 401 (2005) (When interpreting a statute, "we first examine the language of the statute, and . . . [w]hen statutory language is ambiguous, we examine the statute's overall objective and presume that the legislature would not pass an act that would lead to an absurd or illogical result." (internal citations omitted)).

Co. v. Patterson, 456 U.S. 63, 68 (1982)); see also Ouellette v. Town of Kingston, 157 N.H. 604, 614 (2008) ("The traditional rules of statutory construction generally govern our review of ordinances.").  The court's inquiry thus begins with, and centers on, the language of the ordinances.

As discussed supra Section II.A, § 97.34(B) of the Manchester Code permits the City Clerk to issue licenses to businesses in downtown Manchester allowing them to encumber a portion of the sidewalk.  It also states that the licenses are "subject to the insurance provisions contained in § 115.60 of this [C]ode."  Manchester Code § 97.34(B)(2).  Section 115.60(B)(7)(a), in turn, details the compulsory insurance requirement.  It provides that a license application:

> shall include . . . [a] certificate of insurance that the applicant has been issued an insurance policy by an insurance company licensed to do business in the state, protecting the licensee and the city from all claims for damages to property and bodily injury, including death which may arise from operations under or in connection with the license.  Such insurance shall provide combined primary and excess coverage which meet a $500,000 minimum limit; such policy shall provide for automobile liability insurance for owned, nonowned, and hire vehicles as applicable; and such policy shall provide that the policy shall not terminate or be cancelled prior to the expiration date except with 30 days' advance written notice to the city.

Manchester Code § 115.60(B)(7)(a) (emphasis added).  This Section of the ordinance expressly declares that the purpose of the insurance policy, and thus the insurance requirement, is to "protect[] the licensee and the city"-- the insured parties--from claims for damages.  This clearly stated objective renders the ordinance ill-suited for application of the compulsory insurance doctrine, since--according to the insurance law treatise that the plaintiffs rely on--the doctrine is focused on laws that mandate insurance "for the

benefit of members of the public <u>and not of the insured</u>."  Couch on Insurance § 106:27 (emphasis added).

The overall language and design of the ordinances further confirm that the purpose of the insurance requirement is to shield the city from loss, rather than to protect public safety.  First, at a basic level, §115.60 safeguards the city's financial interests by requiring that the city be insured under the policy and notified of the policy's premature cancellation.  No comparable or notable interest in public safety is evidenced by the parameters that the ordinance places on the required insurance policy.

Also, a few paragraphs after setting forth the license requirement for sidewalk encumbrances in § 97.34(B), the ordinance provides that "under the direction and supervision of the City Clerk, portable signage may be erected upon a public right-of-way adjacent to the place of business for the purposes of advertising," though city officials "may impose such reasonable time, place, manner and dimensional requirements as are necessary to <u>protect the public safety</u> and convenience."  Manchester Code § 97.34(E) (emphasis added).  Where the legislative body included the phrase 'public safety' in § 97.34(E) and omitted the phrase in § 97.34(B)--a nearby paragraph within the same Section of the Code--the exclusion should be treated as intentional.  <u>See</u> United States v. Ahlers, 305 F.3d 54, 59-60 (1st Cir. 2002) ("It is accepted lore that when Congress uses certain words in one part of a statute, but omits them in another, an inquiring court should presume that this differential draftsmanship was deliberate.").  The court accordingly declines to interpret § 97.34(B) so as to add in that omitted phrase.  <u>See</u> Bisceglia v. Sec'y of State, 175 N.H. 69, 71-72 (2022) ("We interpret legislative intent from the

statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." (internal citation omitted)).

Having considered the text of the ordinances, the court turns next to a piece of extrinsic evidence that the plaintiffs contend is relevant to the court's assessment of the ordinances' objective.  Faced with a complete dearth of record or legislative evidence supporting their assertion regarding the public safety purpose of the sidewalk encumbrance insurance requirement, the plaintiffs submitted a declaration from the City Clerk, Matthew Normand, in an effort to bolster their position.  In the six-paragraph declaration, Normand states that, "in [his] role as City Clerk," he is "familiar" with the city's compulsory insurance requirements for sidewalk encumbrances and a number of other activities, including "parades, fairs, runs or sporting events."[17]  He then asserts that "[t]hese compulsory insurance requirements are meant to protect the public and the City from acts or omissions committed by licensees."[18]

The court understands and appreciates that the City Clerk is involved in issuing licenses like the one that Penuches held for its sidewalk dining area.  But the court cannot draw any conclusions about the purpose behind the city's compulsory insurance requirements from Normand's declaration, for at least two reasons.  First, as the City Clerk, Normand is not involved in debating or voting on the provisions in the Manchester Code.  Rather, "the [B]oard of [A]ldermen . . . act[s] as the policy making and legislative

---

[17] See doc. no. 47-2 at ¶¶ 2-5.

[18] Id. at ¶ 6.

body for the city government," while the City Clerk "keep[s] a record of all the acts,

votes, and proceedings of the Board of Mayor and Aldermen."  Manchester Code

§§ 2.03(a), 30.22.  Second, the declaration bears no evidentiary weight because it does

not establish the basis for Normand's knowledge of the purpose of the compulsory

insurance requirements.  See Finn v. Consol. Rail Corp., 782 F.2d 13, 16 (1st Cir. 1986)

("[m]aterial that would be inadmissible at trial cannot be considered on a motion for

summary judgment"); Fed. R. Evid. 602 ("A witness may testify to a matter only if

evidence is introduced sufficient to support a finding that the witness has personal

knowledge of the matter."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to

support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated.").  For example, the declaration does not indicate that

Normand drew his conclusion regarding the purpose of the requirements from personal

observation of or involvement in related Board of Mayor and Aldermen meetings or

voting sessions, or from his review of records of such events.[19]

---

[19] The plaintiffs attach two documents to Normand's declaration--the city's Business License
Application Form and Special Events Guide.  The plaintiffs do not meaningfully explain in their
filings or in the declaration how these documents lend support or credibility to Normand's
assertion regarding the public safety purpose of Manchester's compulsory insurance
requirements.  The Special Events Guide does mention public safety a few times, but this does
not alter the court's assessment of the declaration.  The guide states that a special event permit
application may be denied on several grounds, including that "the use or event proposed by the
application would present an unreasonable danger to health or safety of the public or the
[license] applicant."  Doc. no. 47-2 at 26.  This does not suggest that the city's compulsory
insurance requirements for special events are aimed at public safety.  This simply indicates that a
special event may not be permitted if it is a hazard to public safety.  The guide also states that
Fire Watch personnel or additional duty officers may be assigned to special events under some
circumstances "for the safety of the attendees."  See id. at 27-28.  Again, this indicates that some

The plaintiffs finally cite a handful of out-of-circuit cases in which federal and state courts applied the compulsory insurance doctrine under various circumstances to render the insurance carrier's payment obligations absolute, notwithstanding the insured's violation of the insurance contract.  These cases are inapposite or otherwise unpersuasive.

A number of the cases that the plaintiffs cite are readily distinguishable because the compulsory insurance laws at issue, unlike the Manchester ordinances in this case, contained express language acknowledging their public safety purpose.  See, e.g., Huse v. Fulton, 678 F.2d 132, 136 (11th Cir. 1982)  ("[T]he city ordinances in question here were enacted specifically for the protection of Atlanta taxicab passengers.  The 1977 ordinance, for example, specifically required insurance policies to be 'conditioned to protect the public against injury or damage proximately caused by the holder of the permit'"); Johnson v. R & D Enterprises, 106 Ill. App. 3d 496, 498-99 (1982) (applying the compulsory insurance doctrine to a policy issued to satisfy the Illinois Motor Carrier of Property Law and noting that "[t]he purpose behind th[e] [Law's insurance] requirement is indicated by the heading of the paragraph 'Security for the protection of the public.'"); Pan-Am. Cas. Co. v. Basso, 252 S.W.2d 505, 506 (Tex. Civ. App. 1952) ("The [compulsory insurance] ordinance granting . . . the transportation company" permission to operate "required the company to post bonds or insurance policies covering

---

special events pose public safety concerns, but it does not suggest that the compulsory insurance requirements are meant to protect the public in light of such concerns.

its automobiles assuring the operation thereof with due care and caution for the public safety.").

The one out-of-circuit case that arguably lends the most support to the plaintiffs' position is both distinguishable and expressly limited in its application, and thus does not persuade the court to go against New Hampshire precedent and grant the plaintiffs' motion.  In Northwest Airlines, Inc. v. Pro. Aircraft Line Serv., the Eighth Circuit Court of Appeals applied the compulsory insurance doctrine where a county ordinance required that an aircraft maintenance company obtain liability insurance in order to operate at the local airport.  776 F.3d 575, 576-77 (8th Cir. 2015).  An employee of the maintenance company severely damaged an aircraft while servicing it, and the aircraft owner subsequently initiated a negligence action and obtained a default judgment against the company.  Id. at 577.  The court determined that the maintenance company's insurance carrier was obligated to pay the default judgment, notwithstanding the company's failure to notify its insurance carrier of the lawsuit.  Id. at 580.  The court reasoned, in large part, that the county ordinance requiring insurance was "intended, at least in part, to protect injured third parties such as" the aircraft owner, though the ordinance lacked express language to that effect.  Id. (internal quotations omitted).

The court is not inclined to adopt the reasoning and conclusion of Northwest Airlines because the Eighth Circuit Court of Appeals noted that its holding was not in line with the weight of authority.  It acknowledged that "courts encounter the compulsory insurance doctrine most often," though not exclusively, "in the context of statutes requiring auto liability insurance."  Id. at 580.  It further stated that it had not found "any

other court . . . [that] considered whether to apply the compulsory insurance doctrine in circumstances as unusual as those presented here." Id. at 582.

Further, Northwest Airlines is factually distinguishable in that the injured party notified the insurance carrier of its claim "over a year before it filed suit" against the tortfeasor. Id. The Northwest Airlines Court commented that this notification, as well as the insurance carrier's decision to "spurn[] the notice" were "relevant in [its] assessment of th[e] unusual scenario" and its decision to apply the compulsory insurance doctrine to ensure the injured party's recovery. Id.

In sum, upon reviewing the language of the subject ordinances, record evidence regarding their purpose, and case law on the compulsory insurance doctrine, the court finds no basis to apply the doctrine here to shield the plaintiffs from Colony's notice defense. The plaintiffs' summary judgment motion is accordingly denied, and Colony's summary judgment motion is granted.[20]

---

[20] Colony also argues that it is not obligated to pay the default judgment because Margaret's fall was not covered by the insurance policy. The parties agree that, consistent with the relevant Manchester ordinance, the insurance policy covers claims "aris[ing] from operations under or in connection with the license." Manchester Code § 115.60(B)(7)(a). Colony essentially contends that Margaret's fall, which occurred inside the restaurant, was "unrelated" to the outdoor location of her table, and thus did not "arise from" the sidewalk dining activities governed by the license. See Colony's Objection (doc. no. 46) at 15-17. The plaintiffs aver that the phrases "arising out of" and "in connection with" are construed broadly, and thus extend coverage to Margaret's use of the restaurant's restroom while dining outside. See Pls.' Objection (doc. no. 47-1) at 17-18. The court is doubtful that Margaret's fall is sufficiently linked to "operations under or in connection with the license" to trigger the insurance policy's coverage, but the court need not decide this issue since it finds that Penuches' failure to satisfy the notice provisions within the insurance contract released Colony from any payment obligations.

IV.   **Conclusion**

For the reasons stated above, the plaintiffs' motion for summary judgment[21] is

DENIED and Colony's motion for summary judgment[22] is GRANTED.

**SO ORDERED.**

_____

Joseph N. Laplante
United States District Judge

Dated:  May 22, 2023

cc:   Benjamin B. Folsom, Esq.
      Graham Steadman, Esq.
      Bruce W. Felmly, Esq.
      William L. Boesch, Esq.

---

[21] Doc. no. 43.

[22] Doc. no. 45.